David Rosenfeld (DR-8646)
Associate Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   SEP 2 0 2007   ★

BROOKLYN OFFICE

**CV 07      3928**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**GLEESON, J.**

**LEVY, M.J.**

---

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

        -against-

JOSEPH SIMONE; ISLAND CAPITAL MANAGEMENT,
INC.; JOSEPH LANDO; JOSEPH CARACCIOLO; ALFRED
VARRICCHIO; ANTHONY PIANELLI; JILL PIANELLI;
JAP JAP ENTERPRISES, LLC; BRIAN FABRIZZI;
DONALD SORRENTINO; ANTHONY CARANNANTE,
individually and d/b/a A&C MANAGEMENT; STEVEN
DARONZIO, individually and d/b/a A&C MANAGEMENT;
ROCHELLE ROMAN; SHAUN SARNICOLA; ANTHONY
TANICO; ANDREA LANDO-TANICO; AJT LTD.; AJGT
LTD.; MICHAEL McCORMACK; DONNA CENTOLA;
DMAC SERVICES, INC.; ANDREW CACCIOPPOLI;
THOMAS MACLI; DONNA MACLI; LUMAC CORP.;
GARY MANFRE; RICHARD MANFRE; and RAM
SOLUTIONS, INC.,

        Defendants.

Civil Action No.

**COMPLAINT**

---

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against

defendants Joseph Simone ("Simone"); Island Capital Management, Inc. ("Island"); Joseph

Lando ("J. Lando"); Joseph Caracciolo ("Caracciolo"); Alfred Varricchio ("Varricchio");

Anthony Pianelli ("A. Pianelli"); Jill Pianelli ("J. Pianelli"); JAP JAP Enterprises, LLC ("JJE");

Brian Fabrizzi ("Fabrizzi"); Donald Sorrentino ("Sorrentino"); Anthony Carannante ("Carannante"), individually and d/b/a A&C Management ("A&C"); Steven Daronzio ("Daronzio"), individually and d/b/a A&C; Rochelle Roman ("Roman"); Shaun Sarnicola ("Sarnicola"); Anthony Tanico ("Tanico"); Andrea Lando-Tanico ("Lando-Tanico"); AJT Ltd. ("AJT"); AJGT Ltd. ("AJGT"); Michael McCormack ("McCormack"); Donna Centola ("Centola"); DMAC Services, Inc. ("DMAC"); Andrew Caccioppoli ("Caccioppoli"); Thomas Macli ("T. Macli"); Donna Macli ("D. Macli"); LUMAC Corp. ("LUMAC"); Gary Manfre ("G. Manfre"); Richard Manfre ("R. Manfre"); and RAM Solutions, Inc. ("RAM"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This action concerns widespread fraudulent conduct by twenty-one individuals and seven entities involved in the securities lending industry, colloquially known as the "stock loan" business. The defendants include twelve current and former stock loan traders ("Traders") at several major Wall Street brokerage firms, including Van der Moolen Specialists USA, LLC ("VDM"), Janney Montgomery Scott, LLC ("Janney") and Nomura Securities International, Inc. ("Nomura"). From at least 1999 through early 2005, these Traders conspired in various schemes with sixteen purported stock loan "finders" ("Finders") to skim profits on stock loan transactions. The defendants made over $8 million from their unlawful schemes.

2.      The Traders routinely defrauded brokerage firms by engaging in collusive loan transactions and causing sham finder fees to be paid to purported Finders that were in fact entities controlled by the Traders themselves or by their friends and relatives. Acting as fronts for the Traders, these entities received hefty finder fees on thousands of stock loan transactions even though they did not provide any legitimate finding services and, in many cases, were simply shell

2

companies that were not even involved in the stock loan business. The persons controlling the phony Finders included a mailman, a perfume salesman, and a dental receptionist. The Traders shared in the sham finder fees through secret kickback arrangements. Some defendants met monthly at New York City bars and restaurants to exchange thousands of dollars in cash, often wrapped in newspapers or stuffed into envelopes.

3.      The defendants engaged in multiple schemes with overlapping participants, and many of the defendants participated in more than one scheme. The fraudulent schemes involved literally thousands of stock loan transactions in which the following purported Finders received sham finder fees: Island, A&C, AJT, AJGT, DMAC, LUMAC, RAM, and JJE. The defendants' schemes and their respective roles are summarized below.

**The Interrelated Schemes**

4.      While Simone was co-head of the stock loan trading desk at VDM, he engaged in several schemes to defraud VDM using Island, a shell company that he controlled. Simone caused VDM to pay several million dollars in sham finder fees to Island. The following Traders also colluded with Simone to increase his illegal profits through circular loan transactions known as "ring" and "run-through" deals: J. Lando, then head of sales for Janney's stock loan desk; Caracciolo at National Investor Services Corp. ("NISC"); Varricchio at A.G. Edwards & Sons, Inc. ("A.G. Edwards"), and A. Pianelli at Weiss, Peck & Greer, LLC ("Weiss Peck"). Simone paid monthly cash kickbacks to these Traders out of the sham finder fees paid to Island. Simone himself made approximately $3.6 million.

5.      Fabrizzi, the other co-head of VDM's stock loan trading desk, also defrauded VDM through the payment of sham finder fees. Fabrizzi conspired with Carannante, a Finder doing business as A&C, and Sorrentino, a trader at Oppenheimer & Co., Inc. ("Oppenheimer").

3

Fabrizzi and Sorrentino colluded on "run-through" loans between VDM and Oppenheimer that enabled Fabrizzi to have VDM pay sham finder fees to A&C. Carannante kept a portion of the fees and funneled the rest back to Fabrizzi, who paid monthly cash kickbacks to Sorrentino.

6.    Roman and Sarnicola, two Traders at Kellner Dileo & Co. ("Kellner"), conspired with Carannante and Daronzio, another A&C Finder, to cause Kellner to pay sham finder fees to A&C. Carannante and Daronzio kept a portion of the sham fees, and Carannante paid the balance in cash kickbacks to Roman and Sarnicola.

7.    Roman also defrauded Kellner by causing it to pay sham finder fees to AJT and AJGT, two Finders run by relatives of J. Lando -- Tanico and Lando-Tanico, who is J. Lando's sister and Tanico's wife. Tanico paid Roman monthly cash kickbacks and kept the balance of the sham finder fees for himself and Lando-Tanico. J. Lando also caused Janney to pay sham fees to AJT and AJGT.

8.    McCormack, while a Trader at A.G. Edwards, schemed with Centola (his wife), J. Lando and Roman to defraud A.G. Edwards through sham finder fees paid to DMAC, a shell company owned by Centola. McCormack arranged for J. Lando and Roman to have Janney and Kellner borrow stock from A.G. Edwards at inferior rates and then lend the stock to other firms specified by McCormack at better rates. DMAC's sham finder fees were paid out of these artificial profits.

9.    Caccioppoli, a Trader who supervised Janney's stock loan desk, schemed with his sister, D. Macli, and her husband, T. Macli, to defraud Janney by having the firm pay sham finder fees to LUMAC, a shell company owned by D. and T. Macli. T. Macli was a mailman, and D. Macli was a dental receptionist.

4

10.    G. Manfre, a Trader at Nomura, schemed with his brother R. Manfre, Simone and J. Lando to defraud Nomura through sham finder fees paid to RAM, a shell company owned by R. Manfre, a perfume salesman. Simone and J. Lando had VDM and Janney pay sham fees to RAM after G. Manfre had Nomura lend stock to VDM and Janney at inferior interest rates. Simone and J. Lando loaned the same stock to other firms at better rates, and RAM's finder fees were paid out of these artificial profits.

11.    A. Pianelli also schemed with J. Lando to defraud Weiss Peck and Janney by paying sham finder fees to JJE, a purported Finder owned by J. Pianelli, A. Pianelli's wife. J. Lando had Janney pay fees to JJE on loan transactions with Weiss Peck that were arranged entirely by A. Pianelli and J. Lando.

12.    By virtue of the foregoing conduct, each of the defendants, directly or indirectly, singly or in concert, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R § 240.10b-5]; and each of them is also liable in the alternative, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting the violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] committed by those defendants with whom they schemed. Unless each of the defendants is permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to the authority conferred by Section

20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act

[15 U.S.C. § 78u(d)], and seeks to restrain and enjoin the defendants permanently from engaging

in the acts, practices, transactions and courses of business alleged herein. The Commission also

seeks a final judgment ordering the defendants to disgorge their ill-gotten gains and pay

prejudgment interest thereon, and ordering the defendants to pay civil money penalties pursuant

to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange

Act, [15 U.S.C. § 78u(d)(3)].

14.     This Court has jurisdiction over this action, and venue lies in this District,

pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and

Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa]. The defendants,

directly and indirectly, have made use of the means or instrumentalities of, or the means or

instruments of transportation or communication in, interstate commerce, or of the mails, or of the

facilities of a national securities exchange, in connection with the transactions, acts, practices and

courses of business alleged herein. Some of these transactions, acts, practices and courses of

business occurred in the Eastern District of New York, where many of the defendants reside or

transact business.

## THE DEFENDANTS

15.     **Simone**, age 65, resides in Staten Island, New York. From June 1997 until

January 2005, he was a stock loan trader and a registered representative associated with VDM.

Simone was co-head of VDM's stock loan desk and was known in the industry as "The Chief

Inspector."

6

16.     **Island** is a New York corporation with a business address in Bethpage, New York. Simone controlled Island, which purported to provide stock loan finding services.

17.     **J. Lando**, age 34, resides in Milestone, New Jersey. From May 1997 to July 2005, J. Lando was a stock loan trader employed by Janney and head of sales for its stock loan trading desk. J. Lando was then known in the industry as "Joe Janney." He is currently employed as a securities lending representative at Penson Financial Services, Inc. ("Penson"), a registered broker-dealer.

18.     **Caracciolo**, age 33, resides in Staten Island, New York. From in or about June 2000 through July 2005, he was a stock loan trader and registered representative employed by NISC and was known in the industry as "Stock Loan Joe."

19.     **Varricchio**, age 48, resides in Lynbrook, New York. From October 1979 through October 2006, he was a stock loan trader employed by A.G. Edwards.

20.     **A. Pianelli**, age 53, resides in Middletown, New Jersey. From February 1983 through May 2004, A. Pianelli was a stock loan trader employed by Weiss Peck. From June 2004 through December 2004, he was affiliated with JJE, a purported Finder.

21.     **J. Pianelli**, age 51, resides in Middletown, New Jersey. She is married to A. Pianelli. J. Pianelli is the sole shareholder and officer of JJE. She has never been associated with a broker-dealer or otherwise employed in the securities industry.

22.     **JJE** is a New Jersey limited liability company formed in or about February 2004. A. and J. Pianelli controlled JJE, which purported to provide stock loan finding services. JJE's initial business address was the Pianelli residence in Middletown, New Jersey, but was later changed to an office in Red Bank, New Jersey.

7

23.     **Fabrizzi**, age 63, resides in Edison, New Jersey. From May 1997 to February 2005, he was a stock loan trader employed by VDM and co-head of its stock loan trading desk.

24.     **Sorrentino**, age 61, resides in Valley Stream, New York. From June 2002 to February 2005, he was a stock loan trader employed by Oppenheimer.

25.     **Carannante**, age 63, resides in Brick, New Jersey. Since 1993, he has operated a Finder business under the name A&C out of his home.

26.     **Daronzio**, age 47, resides in Hazlet, New Jersey. From April 2003 through December 2004, he was employed by A&C purportedly as a Finder. From May 1999 to March 2003, he was a stock loan trader employed by a registered broker-dealer.

27.     **Roman**, age 39, resides in Hazlet, New Jersey. From October 1997 to January 2005, she was a stock loan trader employed by Kellner.

28.     **Sarnicola**, age 29, resides in Brooklyn, New York. From May 1998 through September 2006, he was a stock loan trader employed by Kellner.

29.     **Tanico**, age 39, resides in Manalapan, New Jersey. From 2000 to December 2004, he purportedly worked as a Finder through AJT and then AJGT. Tanico formed AJT in or about 2000 and installed his mother as the sole officer. From 1994 to 1999, he was a registered representative associated with various broker-dealers located in Staten Island, New York. In December 1999, he consented to an NASD order barring him from association with any NASD member firm as a result of charges that he had an impostor take the Series 7 and 63 exams for him.

30.     **Lando-Tanico**, age 36, resides in Manalapan, New Jersey. She is married to Tanico and is the sister of J. Lando. From April 1997 to February 2002, she was a stock loan trader employed by Southwest Securities Inc. ("Southwest"). After leaving Southwest, she

began working as a Finder through AJT. In or about January 2003, she formed AJGT and continued working as a Finder. From April 2005 to June 2005, she was employed by Janney as a stock loan trader.

31.    **AJT** is a New York corporation with a business address in Staten Island, New York. Even though Tanico's mother is the only person identified in the corporation's records, AJT was controlled by Tanico. AJT purported to provide stock loan finding services.

32.    **AJGT** is a New Jersey corporation with a business address in Morganville, New Jersey. Lando-Tanico is the sole officer and shareholder of AJGT, which purported to provide stock loan finding services.

33.    **McCormack**, age 32, resides in Staten Island, New York. From April 1994 to March 2005, he was employed as a stock loan trader by A.G. Edwards and was known in the industry as "Mikey Irish."

34.    **Centola**, age 31, resides in Staten Island, New York. She has been married to McCormack since in or about September 2002, although they separated in or about April 2004. From March 2001 through April 2004, Centola purportedly worked as a Finder through DMAC. Before forming DMAC, she was a stock loan trader employed by a registered broker-dealer.

35.    **DMAC** is a New York corporation with a business address in Brooklyn, New York. Centola is the sole officer and shareholder of DMAC, which purported to provide stock loan finding services.

36.    **Caccioppoli,** age 47, resides in Mahopac, New York. From December 1991 to July 2005, he was a stock loan trader employed by Janney and supervised Janney's securities lending desk. Caccioppoli is currently employed by Penson as a stock loan trader.

37.     **D. Macli**, age 44, resides in Cortlandt Manor, New York. She is Caccioppoli's sister and has been employed as a dental receptionist for the past 20 years.

38.     **T. Macli**, age 51, resides in Cortlandt Manor, New York. He is married to D. Macli and has been employed as a letter carrier for the past 23 years.

39.     **LUMAC** is a New York corporation with business addresses in Cortlandt Manor, New York and Jefferson Valley, New York, which is the address of an apartment that Caccioppoli's brother was living in during the relevant period. D. Macli and T. Macli are the sole officers and shareholders of LUMAC, which purports to provide stock loan finding services.

40.     **G. Manfre**, age 44, resides in Metuchen, New Jersey. From July 1998 through February 2006, he was a stock loan trader and a registered representative associated with Nomura.

41.     **R. Manfre**, age 38, resides in Bethpage, New York. He is the brother of G. Manfre and has been employed as a perfume salesperson since 1992.

42.     **RAM** is a New York corporation whose business address is R. Manfre's home in Bethpage, New York. R. Manfre is the sole officer and shareholder of RAM, which purported to provide stock loan finding services.

## RELEVANT ENTITIES

43.     **VDM** is registered with the Commission as a broker-dealer and maintains its principal place of business in New York, New York. VDM is a subsidiary of Van der Moolen Holding N.V., which is based in Amsterdam, The Netherlands. VDM closed its stock loan department in or about February 2005.

44.     **Janney** is registered with the Commission as a broker-dealer and maintains its principal place of business in Philadelphia, Pennsylvania.

10

borrow"), the borrower generally pays interest to the lender for the right to borrow the security. This interest payment is called a "negative rebate." The rebates and negative rebates are a percentage of the total market value of the securities and are quoted as annual percentage rates. Stock loan transactions may stay open for as little as one trading day or as long as several months or even a year.

## Roles Of Securities Lending Firms

52.     There are generally three types of securities lending firms, referred to in the industry as "retail" firms, "prime broker" firms and "conduit" firms. The retail firms, which have a large retail customer base, are primarily in the securities lending business to lend securities from their inventory, or "box," to gain short-term access to cash for financing needs. By lending easy-to-borrow securities from their box, retail firms can obtain cash at a more favorable interest rate (i.e. the rebate) than they could obtain from a bank or similar lending institution. When retail firms lend hard-to-borrow securities at negative rebates, they make a profit from the interest they receive. Prime broker firms typically have large institutional and hedge-fund clients, and they often need to borrow significant blocks of securities to cover their customers' short sales. Because prime broker firms have the greatest demand for securities, their loan transactions significantly influence the rates for borrowing those securities. Conduit firms typically borrow securities at low rates, generally from retail firms, and then lend them at higher rates, generally to prime broker firms. The conduit firms profit on the spread between the rates.

## Role And Compensation Of Finders

53.     During the relevant period, most prime broker firms and retail firms, such as NISC, Nomura and Oppenheimer, had policies prohibiting payments to Finders. Many of the

conduit firms, such as VDM, Janney and Kellner, did not prohibit payments to Finders and were the primary source of compensation for Finders.

54.     In the past, Traders typically employed the services of Finders to locate hard-to-borrow stock. In today's securities market, however, Traders rarely need the services of Finders. Technological advances and other improvements have made it easier and faster for Traders to locate hard-to-borrow securities on their own. On April 29, 2005, the New York Stock Exchange ("NYSE") issued an advisory opinion cautioning all member firms about continuing to do business with Finders and stating as follows: "We have seen only limited instances where a finder is actually providing services that an effective stock loan department could not provide."

55.     The Finder's fee would typically be negotiated by the lender and borrower as part of the terms of the loan and, like the rebate rate, expressed in basis points as a percentage of the total market value of the stock. In order to be paid, some Finders submitted an invoice to the broker-dealer that typically included representations to the effect that the Finder performed the services for which the firm was being invoiced.

56.     Although the rebate rates and corresponding finder fees on any particular stock loan transaction may not be large, Traders generally engage in dozens, if not hundreds, of stock loan transactions each day. The rebates and finder fees are calculated and paid on a daily basis, and the brokerage firms and Finders continue to receive payments until the borrowed stock is returned or recalled. Accordingly, loans that remain open for extended periods generate substantial profits for both brokerage firms and Finders even if the rates and spreads are small.

13

## THE DEFENDANTS' FRAUDULENT CONDUCT

### Simone's Multiple Schemes Using Island

57.     From at least 1999 through early 2005, Simone used his position as co-head of VDM's stock loan trading department to misappropriate several million dollars in trading profits from VDM and other brokerage firms.  Simone took control of Island after the death of its owner, who had operated Island as a Finder, and installed a relative as the sole officer and shareholder.  After Simone took over Island, it functioned as a depository for the proceeds of Simone's fraud.

58.     During this period, Simone employed multiple schemes, some involving other Traders, to divert stock lending profits to Island in the form of finder fees on transactions in which neither Island nor anyone else performed finding services.  Simone and the Traders that facilitated his schemes defrauded VDM and other brokerage firms out of several million dollars in sham finder fees paid to Island in connection with thousands of stock loan transactions.  Simone used a portion of the sham finder fees to pay cash kickbacks to the other Traders and diverted the balance to himself and his family.  Simone made approximately $3.6 million from all of his schemes.

59.     When Simone acted alone, he simply placed Island as the finder on order tickets for otherwise legitimate stock loan transactions between VDM and other broker-dealers when, in fact, Island performed no services on those transactions.  In doing so, Simone falsely represented to VDM that Island had performed bona fide finding services for those transactions.  Simone had the discretion to determine Island's "fee," and he often paid Island the majority of the profit generated by a VDM loan, *i.e.* Island (that is Simone) made more money than VDM did from the transaction.

14

60.     When the profit margin on an available loan -- the difference between the rebate rates to be paid and received by VDM -- was too narrow, Simone colluded with Traders at other firms to arrange otherwise unnecessary intermediate, or "run-through," loans at inferior rates to generate a larger spread for VDM.  By colluding with other Traders, Simone was able to increase the volume of profitable deals and the amount of money he could funnel to Island while still recording a profit for VDM.  Simone paid cash kickbacks to these Traders to secure their participation in the scheme.

61.     Simone engaged in this kickback scheme with J. Lando, Caracciolo, Varricchio and A. Pianelli.  In addition to scheming with Simone to defraud VDM, these Traders also defrauded their own firms by causing them to lend or borrow stock at rates that were inferior to other rates available in the marketplace.  The rates were dictated by Simone and were chosen solely to facilitate the fraud.  J. Lando, Caracciolo, Varricchio and A. Pianelli colluded with Simone in exchange for secret, undisclosed cash kickbacks that Simone personally handed out to them each month at restaurants and bars in envelopes or wrapped in newspapers.  The cash kickbacks that Simone paid to these Traders equaled approximately 20 to 30 percent of the sham finder fees that Island received on the deals in which they participated.

62.     Simone did not disclose, and in fact concealed from VDM, that he was causing VDM to pay sham finder fees to Island and was also paying cash kickbacks to the Traders that colluded with him on these transactions.  Simone falsely marked, and caused others at VDM to falsely mark, the order tickets for the relevant loans to reflect that Island provided bona fide finding services for the transactions.  J. Lando, Caracciolo, Varricchio and A. Pianelli did not disclose to their respective firms that they were receiving payments from Simone.

15

63.     Simone's kickback schemes with J. Lando, Caracciolo, Varricchio and A. Pianelli are described more fully below, along with illustrative examples of transactions in which VDM paid sham finder fees to Island and on which Simone paid the other Traders cash kickbacks.

### "Run Through" Deals With J. Lando

64.     In or about January 2003, Simone and J. Lando agreed that in exchange for cash kickbacks from Simone, J. Lando would cause Janney to lend securities to VDM at inferior rates than were otherwise available in the marketplace. From in or about January 2003 through November 2004, Simone and J. Lando caused VDM and Janney to engage in a series of loans that were purposely structured to enable Simone to siphon profits from VDM. These transactions were known as "run-through" deals because VDM was simply acting as an intermediary between Janney and the broker-dealer, usually a prime broker firm needing to cover short-sales, that was actually going to borrow the stock at the better rate than Janney was charging VDM.

65.     For example, on April 8, 2004, J. Lando caused Janney to loan 24,000 shares of Leapfrog (LF) to VDM at a flat rate (i.e. a 0% rebate, meaning neither party was paying interest). Later that same day, Simone caused VDM to loan 24,000 shares of LF to Lehman Brothers in an arms-length transaction at a better rate of negative 3.25% (i.e. Lehman was paying interest to VDM). VDM's artificially inflated profit margin on this transaction was therefore a full 3.25%. At the same time, Simone caused VDM to pay Island a 3% finder fee even though Island did not do anything with respect to that transaction, leaving VDM with a nominal profit of 0.25%. This loan remained open for eight days, and VDM paid Island a total of $344, which Simone and J. Lando later divided among themselves according to their agreed split of the illegal profits.

16

66.  A recorded telephone conversation between J. Lando and Simone on April 8, 2004, shows that J. Lando and Simone orchestrated both sides of the transaction to facilitate Simone's fraud and confirms that no Finder was involved. In this conversation, J. Lando tells Simone that Janney is going to lend the stock to VDM at an inferior rate so that Simone can then lend the same stock to another firm at a better rate, as follows: "I'm sending you . . . Got my early pushes . . . Leapfrog. You can move it at a good negative . . . twenty-four thousand [shares] . . . [a]t a zero." There is no discussion of why J. Lando was willing, contrary to Janney's interests, to loan the stock to Simone at a flat rate when he knows that other firms are willing to pay "a good negative."

67.  In this instance, J. Lando took further advantage of the transaction to cause Janney also to pay a sham finder fee to Lando-Tanico, his sister. J. Lando had obtained the LF shares earlier that day at a positive rebate rate of 1.05% (*i.e.* Janney received interest at that rate) from his other sister, a Trader at Nomura who conducted Nomura's limited conduit stock loan business. The exceptionally favorable rate that Janney received from Nomura allowed J. Lando to pay a sham finder fee to Lando-Tanico on Janney's loan to VDM -- the very same loan on which VDM paid Island its sham finder fee. J. Lando's frequent payment of sham finder fees to Lando-Tanico and Tanico, her husband, is described more fully in paragraphs 102-104 below.

68.  The April 8, 2004, telephone conversation and other recorded conversations between Simone and J. Lando make it clear that their run-through transactions were the product of collusion, not arms-length negotiations, and were purposely structured to generate, at Janney's or another firm's expense, an inflated profit for VDM that Simone could then divert to Island. Simone paid J. Lando monthly cash kickbacks for a period of approximately 23 months, totaling approximately $100,000 or more.

69.     J. Lando did not disclose, and in fact concealed from Janney, that he was receiving cash kickbacks from Simone and colluding with Simone on stock loan transactions that were disadvantageous to Janney and designed to generate a sham finder fee for J. Lando's and Simone's benefit.

### "Ring" Deals With J. Lando And Caracciolo

70.     Simone also engaged in a series of more complicated collusive transactions, called "ring" deals, with J. Lando and Caracciolo at NISC. Simone and J. Lando alternately refer to these deals in recorded telephone conversations as "ringing," "swinging" or "working" the stock. In or about September 2003, J. Lando arranged a meeting with Simone and Caracciolo. At the meeting, Caracciolo agreed to provide Simone with hard-to-borrow stock from NISC's inventory at favorable rates in exchange for undisclosed cash kickbacks from Simone. Because NISC was not authorized at that time to lend stock directly to VDM, J. Lando agreed to allow Caracciolo to run the transactions through Janney. As in the foregoing scheme, Simone then caused VDM to lend the stock to another firm at a much better rate and pay a sham finder fee to Island out of the profits.

71.     For example, on March 22, 2004, Caracciolo caused NISC to loan 10,000 shares of Martha Stewart Living Omnimedia, Inc. stock (MSO) to Janney at a low negative rebate of 1%. J. Lando then caused Janney to loan 10,000 shares of MSO to VDM at a somewhat higher negative rebate of 2%. Simone then caused VDM to loan 10,000 MSO shares to Lazard Freres ("Lazard") at a much higher negative rebate of 7%, and Simone also caused VDM to pay Island a sham finder fee of 4% -- that is, 80% of the profit. As usual, Simone effected the payment to Island by falsely indicating on the order ticket that Island performed finding services. J. Lando then caused Janney to borrow 10,000 shares of MSO from Lazard at a negative rebate of 7.25%

18

and lend 10,000 MSO shares to Bear Stearns at a negative rebate of 8%. All of these loans occurred on the same day. The loan from Janney to VDM stayed open for 49 days, and VDM paid a total of $563.89 to Island, which Simone shared with Caracciolo. The following chart shows each leg of this ring deal:



72.     Recorded telephone conversations between Simone and J. Lando confirm that this and other ring transactions that they arranged were not the product of arms-length negotiations and did not involve a Finder. For example, J. Lando and Simone agreed up front in a telephone conversation on March 22, 2004, that in the above transaction VDM would pay a negative rebate of 2% and then lend the stock to Lazard at a negative rebate of 7%. As with the conversation described above in paragraph 66, there is no discussion of why J. Lando was willing, contrary to Janney's interests, to loan the stock to VDM for 5% less than what J. Lando knew Lazard was willing to pay at the time.

73.     Other recorded conversations show that Simone, J. Lando and Caracciolo orchestrated numerous other collusive ring deals. The three generally spoke each trading day to find out what hard-to-borrow stocks Caracciolo had available for Janney to "ring," and Simone and J. Lando then prearranged the other legs of the transaction.

74.     Simone paid monthly cash kickbacks to Caracciolo from the loan profits that Simone diverted to Island. This scheme lasted until about November 2004, and Simone paid Caracciolo several thousand dollars per month over the course of approximately 15 months. J. Lando benefited from these ring deals by marking up the rates on Janney's loans to VDM for a risk-free profit that increased his compensation from Janney. In some cases, J. Lando had also arranged for Janney to get the stock back from the firm that borrowed it from VDM and re-lend the stock to yet another firm at an even higher rate.

75.     Caracciolo did not disclose, and in fact concealed from NISC, that he was receiving cash kickbacks from Simone and colluding with Simone and J. Lando on stock loan transactions that were disadvantageous to NISC and designed to generate a sham finder fee for Simone's benefit. Even if a particular brokerage firm did not necessarily require its Traders to obtain the *best* rate for certain securities, Traders at each relevant firm were required to investigate and negotiate favorable rates in arms-length transactions. By lending stock to VDM at rates designed to further Simone's scheme in exchange for undisclosed cash kickbacks, Caracciolo breached his duties to his firm. Similarly, J. Lando did not disclose, and in fact concealed from Janney, that he was colluding with Simone and Caracciolo on stock loan transactions that were designed to generate a sham finder fee for Simone's benefit.

76.     From in or about January 2003 through early 2005, Simone caused VDM to pay Island over $500,000 in sham finder fees on over two thousand stock loan transactions involving Janney. In some of these transactions, Simone acted alone, where the available profit margin was already sufficient to accommodate a sham payment to Island. In others, Simone colluded with J. Lando on run-through deals and with Caracciolo and J. Lando on ring deals to inflate the profit margin in the manner described above.

20

## "Run-Through" Deals With Varricchio

77.     From in or about September 2003 through November 2004, Simone also schemed with Varricchio to obtain stock for VDM at inferior rates from A.G. Edwards. Varricchio agreed to collude with Simone in a fraudulent run-through scheme whereby Varricchio would cause A.G. Edwards to lend stock to VDM at inferior rates than were otherwise available in the marketplace in exchange for cash kickbacks from Simone. As in the other run-through schemes described above, Varricchio caused A.G. Edwards to lend stock from its inventory to VDM at inferior rates to enrich himself and Simone, thereby defrauding A.G. Edwards. Simone then caused VDM to loan the same securities to other firms at better rates, while paying Island a sham finder fee out of the inflated profits.

78.     For example, on November 4, 2004, Varricchio caused A.G. Edwards to loan 4,700 shares of Northfield Laboratories stock (NL) to VDM at an inferior positive rebate rate of 1.25%. Later that day, Simone caused VDM to loan the same 4,700 shares of NL to Credit Suisse First Boston at a better rate of negative 12% and to pay Island a sham finder fee of 11.5%. The payment to Island was possible because Varricchio loaned the stock to VDM at an inferior rate, thereby creating a 13.25% spread between VDM's borrowing and lending rates and enabling Simone to divert most of that inflated profit to Island yet still record a 1.75% profit for VDM. This loan remained open for 25 days, and VDM paid Island a total of $560.40, a portion of which Simone later kicked back to Varricchio. Recorded telephone conversations between Varricchio and Simone show that Varricchio was generally aware of the better rates for the securities that he caused A.G. Edwards to loan to VDM.

79.     Each month, Simone paid Varricchio a cash kickback approximately equal to between 20 and 30 percent of the sham finder fees received by Island on transactions that

21

Varricchio facilitated. Simone paid Varricchio cash kickbacks over a period of approximately 15 months.

80.     Varricchio did not disclose, and in fact concealed from A.G. Edwards, that he was receiving cash kickbacks from Simone and colluding with him on stock loan transactions that were disadvantageous to A.G. Edwards and designed to generate a sham finder fee for Simone's benefit.

81.     From in or about September 2003 through early 2005, Simone caused VDM to pay Island over $500,000 in sham finder fees in connection with over two thousand stock loan transactions involving A.G. Edwards and VDM. The vast majority of these transactions, occurred because Varricchio colluded with Simone to cause A.G. Edwards to loan securities to VDM at artificially low rates in exchange for cash kickbacks. In the remaining transactions, Simone acted alone and simply placed Island on the order tickets for the loans.

### "Run-Through" Deals With A. Pianelli

82.     Simone also engaged in a similar kickback scheme with A. Pianelli at Weiss Peck. From in or around at least 2000 through February 2004, A. Pianelli colluded with Simone in a fraudulent run-through scheme whereby A. Pianelli would cause Weiss Peck to borrow stock from VDM at inferior rates, in exchange for cash kickbacks from Simone. As in the other run-through schemes described above, the rates at which A. Pianelli caused Weiss Peck to borrow stock from VDM were not the result of an arms-length negotiation, but were instead designed to enrich himself and Simone, thereby defrauding Weiss Peck. Simone first caused VDM to borrow the securities it would lend to Weiss Peck from another firm at a better rate, and then Simone caused VDM to pay Island a sham finder fee out of the inflated profit that VDM made on the loan to Weiss Peck. Simone caused VDM to pay Island a total of over $200,000 in sham

22

finder fees in connection with hundreds of stock loan transactions involving Weiss Peck and VDM.

83.     For example, on December 8, 2003, Simone caused VDM to borrow 166,200 shares of NASDAQ 100 (QQQ) stock from another broker-dealer, where A. Pianelli's son was employed as a Trader, at a positive rebate rate of 0.1%, *i.e.* the stock was easy-to-borrow and the lender paid interest to VDM. Later that day, A. Pianelli caused Weiss Peck to borrow the same number of shares of QQQ stock from VDM at a negative rebate of 0.1%, *i.e.* this time the borrower (Weiss Peck) paid interest to the lender (VDM). Out of the total of 0.2% in interest that VDM received on these two loans, Simone caused VDM to pay a sham finder fee of 0.1% to Island and VDM kept the remaining 0.1% as a risk-free profit. This transaction remained open until January 6, 2004, and Island received a total of $193 in sham finder fees from VDM, some of which Simone later kicked back to A. Pianelli in cash.

84.     Several recorded telephone conversations on December 8, 2003, between Simone and A. Pianelli show that they arranged the above transaction without any Finder's involvement, and that A. Pianelli could have readily obtained the QQQ shares for Weiss Peck from his son's firm at a better interest rate than the rate he received from Simone. After Simone called A. Pianelli to find out what stocks Weiss Peck was interested in that day, A. Pianelli told Simone that Weiss Peck needed 166,200 shares of QQQ and Simone should borrow the shares from A. Pianelli's son. When Simone asked what rate he should get from A. Pianelli's son, A. Pianelli told Simone not to "worry about it." When Simone was unable to reach A. Pianelli's son, A. Pianelli told Simone that A. Pianelli himself would talk to his son about it and "take care of" arranging the loan from his son's firm to VDM.

23

85.     There is no discussion of why A. Pianelli was willing, contrary to Weiss Peck's interests, to borrow the QQQ stock from VDM and *pay* 0.1% when he knew that he could instead just borrow the stock directly from his son's firm and *receive* 0.1%. There was no legitimate business reason for A. Pianelli to engage in a run-through transaction with VDM, as Weiss Peck and the broker-dealer for which A. Pianelli's son was a Trader were authorized at the time to engage in stock loan transactions directly with each other.

86.     Each month, Simone paid cash kickbacks to A. Pianelli in an amount approximately equal to 25% of the sham finder fees that Island received on the transactions that A. Pianelli facilitated, resulting in an approximate total of over $100,000 in kickbacks. A. Pianelli did not disclose, and in fact concealed from Weiss Peck, that he was receiving monthly cash kickbacks from Simone and colluding with him on stock loan transactions that were disadvantageous to Weiss Peck and designed to generate a sham finder fee for Simone's benefit.

87.     As alleged in paragraphs 128-134 below, A. Pianelli ended his kickback arrangement with Simone in or about February 2004 in order to conduct a fraudulent scheme with J. Lando and JJE, a sham Finder owned by A. Pianelli's wife.

**Fabrizzi's Run-Through Scheme With Carannante And Sorrentino**

88.     Fabrizzi, the other co-head of VDM's stock loan desk, also defrauded VDM and other broker-dealers through the payment of kickbacks and sham finder fees. From in or about May 2003 through December 2004, Fabrizzi engaged in a fraudulent run-through scheme with Sorrentino, a Trader at Oppenheimer, and Carannante, a Finder who did business as A&C.

89.     Sorrentino colluded with Fabrizzi by causing Oppenheimer to loan securities to VDM from Oppenheimer's inventory at inferior rates than were otherwise available in the marketplace in exchange for cash kickbacks from Fabrizzi, thereby defrauding Oppenheimer.

24

Fabrizzi subsequently caused VDM to loan the same securities to other broker-dealers at better rates. On each transaction, Fabrizzi caused VDM to pay A&C a finder fee out of the inflated profit even though neither Carannante nor anyone else associated with A&C performed any finding services on the transaction, thereby defrauding VDM. Fabrizzi falsely represented on the relevant VDM order tickets that A&C had performed finder services. Carannante made the same misrepresentation in the invoices that he submitted to VDM in order for A&C to receive the fee.

90.     To keep track of the sham finder fees paid to A&C, Fabrizzi set up a separate billing number on VDM's books for those payments. Carannante typically kept approximately 10% of the sham fees that Fabrizzi diverted to A&C, and Carannante funneled the remaining 90% back to Fabrizzi by making payments to an entity that Fabrizzi controlled named Javon LLC ("Javon"). Fabrizzi then paid monthly cash kickbacks out of his share to Sorrentino in amounts ranging up to several thousand dollars. From May 2003 to early 2005, Fabrizzi caused VDM to pay a total of nearly $500,000 in sham finder fees to A&C in connection with over one-thousand stock loan transactions between VDM and Oppenheimer. During this period, Carannante paid a total of $454,885 to Fabrizzi via Javon and kept the balance of the sham fees. In most, if not all, of these transactions, Sorrentino caused Oppenheimer to loan securities to VDM at inferior rates in exchange for cash kickbacks from Fabrizzi.

91.     For example, on April 12, 2004, Sorrentino caused Oppenheimer to loan 35,000 shares of Nanogen Inc. stock (NGEN) to VDM at a positive rebate of 0.5%. That same day, Fabrizzi caused VDM to loan 35,000 shares of NGEN to Goldman Sachs in an arms-length deal at a better rate of negative 2.5%. Fabrizzi also caused VDM to pay A&C a 1.75% finder fee even though A&C did not provide any finding services. The sham finder fee paid to A&C amounted to more than 50% of VDM's profit on the transaction. The loan remained open for twenty-three

25

days, and VDM paid A&C a total of $276.60 in sham fees that ultimately went to Fabrizzi, Sorrentino and Carannante.

92.     A recorded telephone conversation on April 12, 2004 between Fabrizzi and Sorrentino confirms that Sorrentino intentionally loaned the NGEN stock from Oppenheimer's inventory to VDM at an inferior rate simply to enable Fabrizzi to generate an inflated profit by re-lending the stock to another firm at a better rate. Sorrentino asked Fabrizzi about the going rate for NGEN, and Fabrizzi told him that it is "definitely going negative something," to which Sorrentino responds: "I'll give you a [positive] half." There is no discussion of why Sorrentino was willing, contrary to Oppenheimer's interests, to loan the stock to Fabrizzi at a positive rebate after learning that others were willing to pay a negative rebate. This conversation also confirms that a Finder was not involved in the transaction.

93.     Fabrizzi did not disclose, and in fact concealed from VDM, that he was causing VDM to pay sham finder fees to A&C and was also paying cash kickbacks to Sorrentino for colluding with him on those transactions. Fabrizzi falsely marked, and caused others at VDM to falsely mark, the order tickets for the relevant loans to reflect that A&C provided bona fide finding services for the transactions.

94.     Sorrentino did not disclose, and in fact concealed from Oppenheimer, that he was receiving monthly cash kickbacks from Fabrizzi for colluding with him on loan transactions that were disadvantageous to Oppenheimer and designed to generate a sham finder fee for Fabrizzi's benefit.

## A&C's Kickback Scheme With Traders At Kellner

95.     Carannante and Daronzio, another Finder associated with A&C, also engaged in two straightforward kickback schemes with Roman and Sarnicola, two Traders at Kellner. In or

26

about June 2003, Daronzio and Roman, who were friends, agreed that Kellner would pay finder fees to A&C on loans in which A&C did not perform any services and that A&C would kick back a portion of the sham fees to Roman. Carannante approved the arrangement. From in or about June 2003 through early 2005, Roman regularly caused Kellner to pay a finder fee to A&C on profitable Kellner loans that she negotiated on her own without the benefit of A&C or any other Finder, thereby defrauding Kellner.

96.     In or about March 2004, Carannante and Daronzio entered into a similar kickback arrangement with Sarnicola. From in or about March 2004 through early 2005, Sarnicola caused Kellner to pay a finder fee to A&C on profitable Kellner loans that he negotiated on his own without the benefit of A&C or any other Finder, thereby defrauding Kellner. From June 2003 through December 2004, Roman and Sarnicola caused Kellner to pay A&C approximately $200,000 in sham finder fees. In furtherance of the scheme, Carannante and Daronzio submitted phony invoices to Kellner requesting payment of finder fees to A&C for services that were never performed.

97.     Carannante kept the majority of the sham fees for himself and A&C, and then distributed the balance in cash to Daronzio, who met Roman and Sarnicola in person once a month to deliver their share of the cash kickbacks.

98.     Roman and Sarnicola did not disclose, and in fact concealed from Kellner, that they were causing Kellner to pay sham finder fees to A&C. Roman and Sarnicola both falsely marked, and caused others at Kellner to falsely mark, the order tickets for the relevant loans to reflect that A&C performed bona fide finding services on those transactions. Roman and Sarnicola also did not disclose, and in fact concealed from Kellner, that they were receiving cash kickbacks from Carannante and Daronzio.

## Roman's Kickback Scheme With AJT And AJGT

99. Roman also defrauded Kellner by causing the firm to pay sham finder fees to AJT and AJGT, which were formed and operated by Lando-Tanico and Tanico, in exchange for cash kickbacks from Tanico. Tanico, who had on occasion performed finding services for Kellner, proposed the kickback scheme to Roman in or about January 2002. Roman agreed to participate and, at Tanico's suggestion, she set up a separate account at Kellner to keep track of the sham finder fee payments to AJT and AJGT and keep those payments separate from any legitimate finder fees.

100. From in or about January 2002 through December 2004, Roman caused Kellner to pay sham finder fees to AJT and AJGT totaling approximately $200,000 on thousands of loan transactions in which AJT and AJGT did not perform any services. In furtherance of the scheme, Tanico submitted phony invoices to Kellner requesting payment of finder fees to AJT and AJGT for services that were never performed. During this period, Tanico paid monthly cash kickbacks to Roman totaling over approximately $30,000.

101. Roman did not disclose, and in fact concealed from Kellner, that she was causing Kellner to pay sham finder fees to AJT and AJGT. Roman falsely marked, and caused others at Kellner to falsely mark, the order tickets for the relevant loans to reflect that AJT and AJGT performed bona fide finding services on those transactions. Roman also did not disclose, and in fact concealed from Kellner, that she was receiving cash kickbacks from Tanico.

## J. Lando's Scheme With AJT And AJGT

102. AJT and AJGT also received sham finder fees from Janney. From in or about November 2002 through early 2005, J. Lando caused Janney to pay finder fees to AJT and AJGT on stock loan transactions in which AJT and AJGT did not perform any finding services. During

this period, J. Lando caused Janney to pay AJT and AJGT a total of $343,497 in finder fees. AJT

and AJGT were formed and operated by J. Lando's sister, Lando-Tanico, and brother-in-law,

Tanico.

103.    In an interview conducted by the NYSE in 2005 as part of an inquiry into stock

lending practices at member firms, J. Lando admitted that he routinely caused Janney to pay

finder fees to AJT and AJGT on certain stock loan transactions even though AJT and AJGT did

not perform any services on those transactions. J. Lando had not previously disclosed this

practice to, and in fact concealed it from, the relevant operations and compliance personnel at

Janney, and J. Lando never disclosed to Janney that AJT and AJGT were run by his sister and her

husband.

104.    J. Lando caused Janney to pay sham finder fees to AJT and AJGT by falsely

marking, or causing others at Janney to falsely mark, the relevant order tickets to reflect that AJT

and AJGT performed bona fide finder services on those transactions. In furtherance of and to

cover up the scheme, Lando-Tanico falsely certified in writing to Janney that AJGT had provided

finding services on those loans.

### McCormack's Scheme With J. Lando, Roman And Centola

105.    J. Lando and Roman also engaged in a scheme with McCormack, a Trader at A.G.

Edwards, to defraud their respective firms through the payment of sham finder fees to DMAC, a

company owned by McCormack's wife, Centola. McCormack and Centola formed DMAC in or

about March 2001 after Centola lost her job as a Trader at a brokerage firm, and they continued

the scheme until approximately January 2005. During this period, DMAC received several

hundred thousand dollars in sham finder fees arranged by McCormack. J. Lando and Roman

colluded with McCormack by causing their respective firms, Janney and Kellner, to act as run-

throughs for McCormack and pay DMAC a finder fee even though DMAC did not perform any services. The scheme was structured in this manner because A.G. Edwards prohibited its Traders from paying Finders.

106.    From March 2001 through December 2004, Janney and Kellner paid DMAC over $600,000 in sham finder fees on thousands of stock loan transactions. McCormack arranged the loans on his own and DMAC did not perform any services at all for the fees it received. McCormack caused A.G. Edwards to lend stock to Janney and Kellner at inferior rates, and J. Lando and Roman then caused their firms to lend the same stock at better rates to other broker-dealers identified in advance by McCormack.

107.    McCormack knew from the outset that these other firms were looking to borrow the stock at the better rates, and he could have had A.G. Edwards lend the stock directly to them. Instead, McCormack had the run-through firms make the profit and use that profit to pay DMAC a sham finder fee. J. Lando and Roman facilitated McCormack's scheme because Janney and Kellner made a risk-free profit on the difference between what they paid A.G. Edwards and what they received from the firm to which they loaned the stock, less the payment to DMAC.

108.    Emails from McCormack to persons working for J. Lando and Roman confirm that J. Lando, Roman and McCormack did not engage in arms-length negotiations on these transactions. The emails further confirm that McCormack arranged the transactions solely to extract a sham payment to DMAC at the expense of A.G. Edwards. Specifically, the emails demonstrate that McCormack orchestrated the deals and told the Traders at the run-through firms: (i) the inferior rates at which A.G. Edwards would lend stock to the run-through firms; (ii) the better rates the run-through firms would receive from the other firms for the stock; and

30

(iii) how much the run-through firms were to pay DMAC. These emails further demonstrate that DMAC did not provide any finding services on any of these loans.

109.    For example, on April 7, 2004, McCormack caused A.G. Edwards to run a loan of 9,800 shares of Nanogen stock (NGEN) through Kellner at an inferior rate of positive 0.75% (*i.e.* A.G. Edwards the lender pays Kellner the borrower) instead of loaning the shares directly to Bank of America ("BOA") at the better rate of negative 2.0% that BOA then paid to Kellner. Kellner paid DMAC a 2.0% finder fee on its loan to BOA.

110.    Earlier that day, McCormack sent an email to a Trader working for Roman. This email confirms that McCormack himself arranged both legs of the deal, knew that the available rate for NGEN was significantly better than the run-through rate he selected for A.G. Edwards' loan to Kellner, and that DMAC was not involved in the transaction: "I have a run through for you. I'm sending you 9800 [shares of] NGEN price is 10 [dollars per share]. I'll pay you 0.75. Send it to 773 [BOA Securities]. Pay them negative [*i.e.* receive] 2.00. Pay Donna [Centola] 2.00 on the borrow side." In other words, McCormack chose to have A.G. Edwards *pay* Kellner on the loan instead of *receive* payment from BOA. As a result, Kellner made a profit of 0.75% for acting as the run-through firm, McCormack and Centola made 2.0% profit through DMAC, and A.G. Edwards lost money on this transaction.

111.    McCormack never disclosed, and in fact concealed from A.G. Edwards, that he was colluding with other Traders and causing A.G. Edwards to enter into stock loan transactions that were disadvantageous to A.G. Edwards for the purpose of generating sham finder fees for McCormack's own benefit.

112.    Roman did not disclose, and in fact concealed from Kellner, that she was colluding with McCormack and causing Kellner to pay sham finder fees for McCormack's

benefit. Roman falsely marked, and caused others at Kellner to falsely mark, the order tickets for the relevant loans to reflect that DMAC provided bona fide finding services on those transactions.

113. J. Lando did not disclose, and in fact concealed from Janney, that he was colluding with McCormack and causing Janney to pay sham finder fees for McCormack's benefit. J. Lando falsely marked, and caused others at Janney to falsely mark, the order tickets for the relevant loans to reflect that DMAC provided bona fide finding services on those transactions.

114. In furtherance of the scheme, Centola (a) submitted phony invoices to Kellner requesting payments of finder fees to DMAC for services that were never performed; and (b) falsely certified in writing to Janney that DMAC had provided finding services on loans for which DMAC was seeking payment but as to which DMAC had not, in fact, performed any services. McCormack and Centola shared the payments to DMAC for the duration of the scheme.

## Caccioppoli's Scheme With The Maclis

115. While supervising Janney's stock loan desk, Caccioppoli routinely defrauded the firm. From at least December 2002 through early 2005, Caccioppoli caused Janney to pay sham finder fees to his sister, D. Macli, and her husband, T. Macli. The Maclis owned LUMAC, a purported Finder, and Janney paid over $350,000 in sham finder fees to LUMAC on over one thousand stock loan transactions during this period. LUMAC did not perform any services on any of those transactions.

116. Both Maclis had full-time jobs outside the securities industry during this period. T. Macli was a letter carrier for the Postal Service, and D. Macli worked for a dentist as a

32

receptionist. Neither one of them ever had any experience in the securities industry. Caccioppoli simply placed LUMAC as the Finder on order tickets for transactions he had negotiated without the services of LUMAC or any Finder, and where there was a sufficient profit margin for Janney to pay LUMAC and still record a profit.

117.    In an interview conducted by the NYSE in 2005 as part of its inquiry into stock lending practices at member firms, Caccioppoli admitted that he routinely caused Janney to pay finder fees to LUMAC on certain stock loan transactions even though LUMAC did not perform any services on those transactions. Caccioppoli had not previously disclosed this practice to, and in fact concealed it from, the relevant operations and compliance personnel at Janney, and he never disclosed to Janney that LUMAC was run by his sister and her husband. As described above, Caccioppoli falsely marked, and caused others at Janney to falsely mark, the relevant order tickets to reflect that LUMAC provided bona fide finding services for the transactions on which it was paid.

118.    In furtherance of and to cover up the scheme, T. Macli and D. Macli falsely certified in writing to Janney that LUMAC was a genuine finder business and had provided finding services on the loans for which it was being paid. The Maclis transferred the funds that Janney paid to LUMAC to their personal accounts, wrote numerous checks to themselves and then cashed those checks.

**The Manfres' Scheme With Simone And J. Lando**

119.    Simone and J. Lando also colluded with G. Manfre, a Trader at Nomura, in a scheme to defraud their respective firms through the payment of sham finder fees to RAM, a shell company owned by G. Manfre's brother, R. Manfre. G. Manfre was the Nomura Trader responsible for lending stock from Nomura's inventory, and he used his position to engage in a

run-through scheme with Simone and J. Lando whereby G. Manfre would cause Nomura to lend stock to VDM and Janney at inferior rates in exchange for sham finder fee payments to RAM. Pursuant to the scheme, Simone and J. Lando then loaned the same stock to other firms at better rates, creating enough of a spread to allow VDM and Janney to pay RAM and still record a profit. The scheme was structured in this manner because Nomura prohibited payments to Finders.

120. G. Manfre and Simone agreed to this arrangement in or about November 2002, and G. Manfre entered into the same arrangement with J. Lando in or about February 2003. From November 2002 through early 2005, Simone and J. Lando respectively caused VDM and Janney to pay a total of approximately $80,848 in finder fees to RAM on over two thousand transactions in which RAM did not perform any finding services.

121. Simone and J. Lando benefited from the Nomura transactions that G. Manfre ran through VDM and Janney because they increased the profitability of their stock loan desks and, as a result, increased their incentive compensation. Manfre would not have steered the same volume of Nomura business to VDM and Janney if Simone and J. Lando had not agreed to pay RAM. G. Manfre's loans from Nomura's inventory represented significant additional business for VDM and Janney. Simone and J. Lando made a risk-free profit on the difference between the low rate they paid Nomura and the higher rate they received from the firm to which they later loaned the stock, less the payment to RAM.

122. R. Manfre is a perfume salesman who, earlier in 2002, tried but failed to find work with a broker-dealer as a Trader. After several unsuccessful attempts, G. Manfre advised R. Manfre to start a Finder business. R. Manfre then formed RAM but continued working as a perfume salesman and never performed bona fide finding services. All the loans by Nomura for

which RAM was paid were prearranged by G. Manfre and were not arms-length transactions. G. Manfre told Simone and J. Lando which stocks he wanted them to borrow from Nomura and at what rates. Each morning, G. Manfre sent an email to J. Lando and someone who worked for Simone listing Nomura's "Specials and Hard Stocks in [inventory]" that G. Manfre was willing to loan to Janney or VDM in exchange for finder payments to RAM.

123.    For example, on March 31, 2004, G. Manfre emailed his daily "Specials and Hard Stocks" list to J. Lando at Janney and someone at VDM acting on Simone's behalf. The list included Winn-Dixie Stores, Inc. stock (WIN) and, later that day, J. Lando caused Janney to borrow 29,300 shares of WIN from Nomura at a flat rate of 0%. J. Lando then had Janney lend 29,300 shares of WIN to another brokerage firm at a better rate of negative 2% and pay RAM a 0.25% finders' fee even though RAM did not provide any services. These loans remained open for fifty-four days, and Janney paid RAM a total of $71.28 in fees.

124.    G. Manfre never disclosed, and in fact concealed from Nomura, that he was colluding with other Traders and causing Nomura to enter into stock loan transactions that were disadvantageous to Nomura for the purpose of generating sham finder fees for his own benefit.

125.    Simone did not disclose, and in fact concealed from VDM, that he was colluding with G. Manfre and causing VDM to pay sham finder fees to RAM for G. Manfre's benefit. Simone falsely marked, and caused others at VDM to falsely mark, the order tickets for the relevant loans to reflect that RAM provided bona fide finding services on those transactions.

126.    J. Lando did not disclose, and in fact concealed from Janney, that he was colluding with G. Manfre and causing Janney to pay sham finder fees to RAM for G. Manfre's benefit. J. Lando falsely marked, and caused others at Janney to falsely mark, the order tickets for the relevant loans to reflect that RAM provided bona fide finding services.

35

127.    In furtherance of and to cover up the scheme, R. Manfre falsely certified in writing to Janney that RAM was a genuine finder business and had provided finding services on the loans for which it was being paid.

## The Pianellis' Scheme With J. Lando

128.    J. Lando also schemed with A. Pianelli at Weiss Peck to pay sham finder fees to JJE, a purported Finder owned by A. Pianelli's wife, J. Pianelli. J. Pianelli formed JJE in or about February 2004 at A. Pianelli's direction, because he was purportedly planning to work as a Finder after Weiss Peck closed its stock loan department, which occurred in or about May 2004. J. Lando's father previously worked for Weiss Peck and was A. Pianelli's boss, and J. Lando subsequently developed a relationship with A. Pianelli.

129.    From in or about February 2004 through May of 2004 -- while A. Pianelli was still at Weiss Peck -- J. Lando caused Janney to pay over $50,000 in sham finder fees to JJE on over one hundred stock loan transactions with Weiss Peck in which JJE did not perform any services. These loans were prearranged by A. Pianelli and J. Lando without any assistance from JJE or any Finder and were collusive, not arms-length, transactions. During the relevant period, J. Pianelli worked at home as a housewife and was not a Finder.

130.    Pursuant to their scheme, A. Pianelli gave J. Lando a daily list of securities that Weiss Peck needed to borrow. J. Lando caused Janney to borrow one or more of those securities from other broker-dealers in arms-length transactions and then, pursuant to their scheme, A. Pianelli caused Weiss Peck to borrow those same securities from Janney at inferior rates. Even though Weiss Peck was thereby disadvantaged and could have obtained the securities in the market at better rates, A. Pianelli caused Weiss Peck to borrow the securities from Janney at inferior rates because he needed to guarantee Janney a hefty profit on these transactions.

36

Pursuant to the scheme, J. Lando used that inflated profit to cause Janney to pay a sham finder fee to JJE and kept the balance as a risk-free profit for Janney.

131.    For example, on February 18, 2004, J. Lando caused Janney to borrow 14,000 shares of Amerisource Bergen Corp. (ABC) stock from another broker-dealer at a positive rebate rate of 0.95% (*i.e.* it was an easy-to-borrow stock and the lender paid interest to Janney). Later that day, A. Pianelli caused Weiss Peck to borrow the same number of ABC shares from Janney at an inferior positive rebate rate of just 0.125%, *i.e.* unlike Janney, Weiss Peck received barely one-eighth of the better rate. Out of the 0.825% spread between what Janney received and what Janney paid Weiss Peck on the loan, J. Lando caused Janney to pay JJE a sham finder fee of 0.5% and Janney kept the remaining 0.325% as a risk-free profit. This transaction remained open until May 11, 2004, and JJE received a total of $932 in sham finder fees from Janney. Weiss Peck and Janney entered into 16 other collusive loan transactions on February 18, 2004, alone, resulting in the payment of an additional $6,902 in sham finder fees to JJE.

132.    A. Pianelli did not disclose, and in fact concealed from Weiss Peck, that he was colluding with J. Lando and causing Weiss Peck to enter into stock loan transactions that were disadvantageous to Weiss Peck for the purpose of generating sham finder fees for A. Pianelli's own benefit.

133.    J. Lando did not disclose, and in fact concealed from Janney, that J. Lando was colluding with A. Pianelli and causing Janney to pay sham finder fees to JJE for A. Pianelli's benefit. J. Lando falsely marked, and caused others at Janney to falsely mark, the order tickets for the relevant loans to reflect that JJE provided bona fide finding services.

134.    In furtherance of and to cover up the scheme, J. Pianelli falsely certified in writing to Janney that JJE was a genuine finder business and had provided finding services on the loans

37

for which it was paid. J. Pianelli transferred the funds that Janney paid to JJE from JJE's bank accounts to herself and A. Pianelli.

## CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5

135.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 134.

136.    The defendants directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in the offer or sale and in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

137.    As part and in furtherance of the fraudulent scheme and other violative conduct described above, the defendants, directly or indirectly, singly or in concert, employed the deceptive devices and contrivances, made the misrepresentations and omitted to state the facts alleged above in paragraphs 1-11 and 57-134.

138.    The false and misleading statements and omissions made by the defendants, more fully described above in paragraphs 1-11 and 57-134, were material.

38

139. The defendants knew, or were reckless in not knowing, that these material misrepresentations and omissions, more fully described above in paragraphs 1-11 and 57-134, were false or misleading, and the defendants otherwise acted with the requisite scienter by knowingly or recklessly engaging in one or more of the fraudulent schemes described above in paragraphs 1-11 and 57-134.

140. By reason of the acts, statements, omissions, practices, and courses of business alleged herein, the defendants, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

141. By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act, the defendants, singly or in concert, directly or indirectly, also aided and abetted the violations committed by those defendants with whom they schemed to defraud by knowingly providing substantial assistance to such other defendants' violations of, and unless enjoined will again aid and abet violations of, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently enjoining and restraining each of the defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### II.

Ordering each of the defendants to disgorge the ill-gotten gains they received from the violations alleged herein, and to pay prejudgment interest thereon.

### III.

Ordering each of the defendants, other than R. Manfre and RAM, to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

# IV.

Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      September 20, 2007

 

David Rosenfeld (DR-8646)
Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153

Of Counsel:

    George N. Stepaniuk
    Joseph P. Dever, Jr.
    Burk Burnett
    Kenneth V. Byrne
    Karen M. Lee

41